UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**CHRISTINE BOWDEN,**

      **Plaintiff,**

   v.                                      Civil Action 2:19-cv-5577
                                             Magistrate Judge Chelsey M. Vascura

**COMMISSIONER OF SOCIAL
SECURITY,**

      **Defendant.**

**OPINION AND ORDER**

     Plaintiff, Christine Bowden ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Social Security Disability Insurance benefits. This matter is before the Court on Plaintiff's Statement of Errors (ECF No. 18), the Commissioner's Memorandum in Opposition (ECF No. 21), and the administrative record (ECF No. 11). For the reasons that follow, Plaintiff's Statement of Errors is **OVERRULED**, and the Commissioner's decision is **AFFIRMED**.

                                 **I.**      **PROCEDURAL HISTORY**

     On September 11, 2013, Plaintiff was awarded Disability Insurance Benefits beginning April 6, 2009, based on a finding that her posttraumatic stress disorder medically equaled the criteria of Listing 12.06 (anxiety and related disorders) of 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17.) On December 1, 2017, after a Continuing Disability Review was completed, the Social Security Administration determined that Plaintiff was no longer disabled

as of that date. (R. 117.)[1] This determination was upheld upon reconsideration after a disability hearing by a State Agency Disability Hearing Officer. Thereafter, Plaintiff filed timely written request for a hearing before an Administrative Law Judge. Plaintiff, represented by counsel, appeared and testified at a hearing held on August 16, 2019, before Administrative Law Judge ("ALJ") Jeffrey Hartnranft. (R. 46–97.) Vocational expert Michael Klein (the "VE") and medical expert Dr. Jeffrey N. Andert (the "ME") also appeared and testified at the hearing. On September 19, 2019, the ALJ issued a decision finding that Plaintiff's disability under §§ 216(i) and 223(f) of the Social Security Act ended as of December 4, 2017. (R. 15–35.) On October 23, 2019, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. 1–6.) Plaintiff then timely commenced the instant action. (ECF No. 1.)

In her Statement of Errors (ECF No. 18), Plaintiff asserts two contentions of error: (1) the ALJ's finding that medical improvement occurred is not supported by substantial evidence; and (2) the ALJ improperly relied on a report by the Cooperative Disability Investigations Unit ("CDIU") despite lack of evidentiary support.

## II. RELEVANT RECORD EVIDENCE

### A. CDIU Investigation

On July 7, 2018, Plaintiff's Continuing Disability Review ("CDR") was referred to the Cooperative Disability Investigation Unit ("CDIU") for evaluation of possible "fraud or similar

---

[1] The Cessation or Continuance of Disability or Blindness Determination and Transmittal (R. 117) is dated December 1, 2017, and states that Plaintiff's disability ceased on December 4, 2017. Because this is logically impossible, and because other documents refer to Plaintiff's disability ceasing on December 1, 2017 (*e.g.*, R. 124), the Court assumes that the December 4, 2017 date was entered in error, even though the December 4 date is used by the ALJ.

fault" or to further support Plaintiff's statements and credibility.[2] (R. 103.) On October 31, 2017, at 7:00 p.m., CDIU Detectives James Falb and Michael Kelly attempted to contact Plaintiff in person at her residence, but there was no answer at the door. (*Id.* 1114.) One of the detectives left a business card with his contact information at Plaintiff's residence. (*Id.*) Plaintiff later reported that she did not answer the door because she was "upset, confused and panicked about her safety" due to the presence of two unknown men at her home. (R. 366.) Instead, Plaintiff called a friend, a Reynoldsburg, Ohio police officer, who recommended that Plaintiff call the phone number on the business card. (*Id.*) After doing so, Plaintiff was told that the detectives worked for the Cooperative Disability Investigations Unit and that they wished to speak with her regarding an unrelated law enforcement matter. (*Id.*) Plaintiff then spoke with Detective Kelly on the phone and arranged for the detectives to return to her residence that night. (*Id.* 1114.) Kelly advised Plaintiff that she may have been the victim of identity theft. (R. 366.)

During the interview, Plaintiff responded to the detectives' questions, disclosing her residential status, banking information, and social media accounts. (R. 1114–15.) She reported working part-time as a fitness trainer at OSU New Albany Campus, and that she is retired from the US Army after having served in Kosovo, Serbia, and the Middle East. (*Id.* 1115.) Kelly later confirmed that Plaintiff was in the US Army Reserves and was deployed in a combat role. (*Id.*) Plaintiff reported that she has a master's degree in criminal justice and was currently pursuing a master's degree in ecotheology at Methodist Theological School in Ohio, which she hoped to use

---

[2] Social Security Ruling 16-2 states, "[s]ections 205(u) and 1631(e)(7) of the Act provide that we must disregard evidence if there is reason to believe that fraud or similar fault was involved in the providing of that evidence. These sections explain that similar fault is involved if: '(A) an incorrect or incomplete statement that is material to the determination is knowingly made; or (B) information that is material to the determination is knowingly concealed.'" 2016 WL 1029285, *2–3 (S.S.A. Mar. 14, 2016).

3

for overseas work with Doctors Without Borders.  (*Id.*)  Plaintiff also reported that she is on the military Olympic triathlon team and is training for the Olympics in China, and that she travels quite often for athletic competitions, including in May, June, August, and September 2017.  (*Id.*)  She also went fly fishing in September 2017.  (*Id.*)  Plaintiff's boyfriend, who was also present for the interview, confirmed that he had traveled with her on the most recent trips.  (*Id.*)  Plaintiff's appearance during the 45-minute interview was groomed and clean, and she was very outgoing, polite, attentive, cooperative, articulate, pleasant, and personable, without displaying any anxiety, depression, or nervousness.  (*Id.*)

The detectives also reviewed Plaintiff's social media activity.  Her Facebook accounts listed that she is a personal fitness trainer, yoga instructor, and reiki practitioner.  (*Id.* 1116.)  She frequently used social media to announce upcoming fitness classes she was teaching and encourage people to join her.  (*Id.* 1113.)  Plaintiff also made a blog post in April 2016 stating that she had won a government contract for fiscal year 2016–17 to conduct trauma sensitive yoga classes on the armed forces base in Columbus, Ohio.  The blog also states that Plaintiff continued to present regionally and nationally for Shape America, OAHPERD [Ohio Association for Health, Physical Education, Recreation, and Dance], and other agencies in the fields of dance, fitness, nutrition, and wellness.  (*Id.*)  Plaintiff also maintained a LinkedIn account, which listed many jobs, indicating that she was presently working at many of them.  (*Id.*)  She also had a current status on Facebook that she was in a relationship.  (*Id.*)

The CDIU detectives stated that information Plaintiff provided during the interview, as well as her social media activity, "seems very inconsistent with her statements on the current CDR application that she does not have any hobbies and that she has difficulty remembering to take her medications, do chores, difficulty seeing, concentrating, remembering, and getting along

with others." (R. 1113.) They further stated that "[i]t would seem that if [Plaintiff] is in two master degree programs, maintaining a 4.0 GPA, and able to be so active in her community, that her anxiety and other psychological impairments must be fairly well controlled." (*Id.*) Based on the CDIU investigation, the Social Security Administration found that, "[b]ased on the preponderance of the evidence, there is reason to believe that [Plaintiff] knowingly concealed and provided incorrect information concerning her mental limitations and her ability to function on a daily basis," and concluded that Plaintiff had committed "similar fault" in connection with her disability claim. (R. 107.) As a result, it was found appropriate to "disregard the information provided by [Plaintiff] regarding her abilities, activities and functioning. This includes [Plaintiff's] report of symptoms and limitations to the DDS as well as the VA." (*Id.* 107–08.)

**B.     State Agency Psychological Consultants**

**1.     Robyn Murry-Hoffman, Ph.D.**

At the initial level of the Continuing Disability Review ("CDR"), state psychological consultant Robyn Murry-Hoffman, Ph.D., noted that as of the Comparison Point Decision ("CPD") in September 2013, Plaintiff's impairments met or equaled the paragraph A and B criteria of Listing 12.06 (anxiety-related disorders). (R. 108.) Relying on evidence that Plaintiff was working as a personal fitness trainer and yoga instructor, was attending graduate school full time, trained and traveled for various athletic competitions, declined treatment for PTSD, was taking escitalopram (an anti-depressant) and alprazolam (an anti-anxiety medication), and that a recent evaluation at the VA reflected overreporting of psychological symptoms, Dr. Murry-Hoffman concluded that, as of her file review on November 13, 2017, the "[o]verall evidence does not support listing-level impairment" and that "MI [medical improvement] is noted." (*Id.* 108–09.) Specifically, although Plaintiff had met the paragraph B criteria of Listing 12.06 as of the CPD, Dr. Murry-Hoffman opined that Plaintiff now had only mild limitation on her ability to

5

interact with others, and no limitations in the areas of understanding, remembering, or applying information; concentration, persistence, or pace; or adapting or managing oneself. (*Id.* 109.)

### 2. Cindi Matyi, Ph.D.

State agency psychological consultant Cindi Matyi, Ph.D., reviewed Plaintiff's file on March 1, 2018. (R. 1336–71.) Dr. Matyi summarized Plaintiff's symptoms as of the Comparison Point Decision ("CPD") in 2013 as follows:

> Clmt alleged disability due to PTSD, acute anxiety, migraines, PTSD, MDD, acute anxiety, migraines, GERD. Records shows clmt reporting flashbacks, intrusive thoughts, nightmares of traumatic events, physiological arousal. Mood depressed and anxious. Clmt reported worrying about school and thoughts of her father who died in 2009. Traumatic incidents involved an explosion to a car in front of the vehicle she was driving, as well as living at shelters at times with her mother. ADLs: unable to work in close quarters, prepares food, cleans and does laundry, goes outside several times weekly, drives, manages money, swims, plays volleyball, dances, talks to others on the phone and on campus.

(R. 1370.) Dr. Matyi then noted that on CDR, it was determined that medical improvement had occurred, and that the CDIU "determined that information provided by [Plaintiff] regarding her abilities, activities and functioning should be disregarded" with a cessation of disability as of December 1, 2017. (*Id.*) Dr. Matyi opined that the cessation review may have been flawed:

> Review of the CDR cessation suggests that the decision did not take into account the complex nature of borderline personality disorder (primary diagnosis) or some unique aspects involved in evaluating military casualty cases. That is to say, what may appear on the surface to be purposeful distortion actually reflects significant psychopathology. Like many similar individuals, this woman is moody, easily agitated, dramatic and somewhat grandiose. VAMC documentation establishes a tie between her military experience and psychiatric impairment (70% service-connected for PTSD).

(*Id.*) However, Dr. Matyi nevertheless agreed with the CDR's ultimate conclusion that medical improvement had occurred:

> Updated information, combined with data in file at CDR, suggests ongoing anxiety, mood dysregulation, and so forth. All data (including 2013 information) indicate that her reported eating disorder reflects borderline personality disturbance. Her clinical presentation is similar to CPD. However, she is under psychiatric care

6

> (medication, counseling) and interventions attenuate her condition, such that her current sx are less intense and her functioning is better than at CPD. Medical improvement has occurred.

(*Id.*)

With regard to the Listings, Dr. Matyi concluded that, although Plaintiff currently met the paragraph A criteria for Listings 12.04 (depressive, bipolar, and related disorders), 12.08 (personality and impulse-control disorders), and 12.15 (trauma- and stressor-related disorders), she did not meet the paragraph B or C criteria for any mental illness-related Listing. (R. 1339–49.) Specifically, Dr. Matyi found Plaintiff had mild limitations in the area of understanding, remembering, or applying information, and moderate limitations in the areas of interacting with others, concentration, persistence, or pace, and adapting or managing oneself. (*Id.* 1348.)

**C.** **Hearing Testimony by Medical Expert Dr. Jeffrey N. Andert**

At the August 16, 2019 hearing, medical expert Dr. Jeffrey N. Andert (the "ME") testified that he had reviewed Plaintiff's file and opined that Plaintiff suffered from three impairments: depressive disorder, posttraumatic stress disorder, and borderline personality disorder. (R. 51–52.) The ME further opined that, although the record reflects some anxiety-related diagnoses, those symptoms would be encompassed within the posttraumatic stress disorder. (*Id.* 52.) The ME also noted Plaintiff's eating disorder, but opined that it did not rise to the level of a severe impairment. (*Id.*) The ME then testified that Plaintiff's impairments, alone or in combination, do not meet or medically equal any of the Listings of 20 C.F.R. Part 404, Subpart P, Appendix A. (*Id.*) Specifically, the ME opined that Plaintiff's impairments would meet the paragraph A criteria of Listings 12.04 (depressive, bipolar and related disorders), 12.08 (personality and impulse-control disorders), and 12.15 (trauma- and stressor-related disorders), but would not meet the paragraph B or C criteria of those listings. (*Id.* 52–54.) As to the paragraph B criteria, the ME opined that Plaintiff was moderately limited in the areas of

7

interacting with others; concentration, persistence, or pace; and adapting and managing herself; with only mild limitations in understanding, remembering, and applying information. (*Id.* 53.) The ME testified that his opinions were based on the record as a whole, including the facts that one of Plaintiff's master's degrees was earned prior to her military service and the other one was never completed. (*Id.* 56.)

### III. THE ALJ'S DECISION

On September 19, 2019, the ALJ issued a decision finding that Plaintiff was no longer disabled within the meaning of the Social Security Act as of December 4, 2017. (R. 15–35.) The ALJ noted that the most recent decision finding Plaintiff disabled was dated April 6, 2009 (the "comparison point decision" or "CPD.") (R. 17.) At the time of the CPD, Plaintiff had medically determinable impairments of posttraumatic stress disorder, which was found to medically equal Listing 12.06AB (anxiety-related disorders) of 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) At step one of the sequential evaluation process,[3] the ALJ determined that

---

[3] Social Security Regulations require ALJs to determine whether a claimant continues to be disabled through an eight-step evaluation of the evidence. *See* 20 C.F.R. § 404.1594(f). If fully considered, the sequential evaluation considers and answers eight questions:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant's disability will be found to have ended.
2. If not, does the claimant have an impairment alone or in combination, meet or equal the severity of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1? If so, the claimant's disability will be found to continue.
3. If not, has there been medical improvement as shown by a decrease in medical severity? If not, the evaluation proceeds to step 5.
4. If there has been medical improvement, is it related to the ability of the claimant to do work? If not, the evaluation proceeds to step 5; if so, the evaluation proceeds to step 6.
5. This step contains the exceptions to continuing disability even when no medical improvement is found in step 3 or the improvement is not related to ability to do work in step 4. If no exceptions apply, the claimant's disability will be found to continue. If one of the first group of exceptions to medical improvement applies, the evaluation proceeds to step 6. If an exception from the second group applies, the claimant's disability will be found to have ended.

8

Plaintiff had not engaged in substantial gainful activity through September 19, 2019. (*Id.*) Although Plaintiff had, as of December 4, 2017, the medically determinable impairments of migraines with photophobia, history of reported traumatic brain injury, asthma, posttraumatic stress disorder, major depressive disorder, borderline personality disorder, unspecified eating disorder, history of Achilles tendon rupture, degenerative joint disease bilateral hips, and cervicalgia, the ALJ determined at step two that her impairments did not meet or equal the severity of Listing any impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*) At step three, the ALJ found that medical improvement had occurred as of December 4, 2017, and that the medical improvement was related to Plaintiff's ability to work because she no longer met or equaled the same listing that was satisfied at the time of the CPD. (*Id.* at 18–19.) Although Plaintiff continued to have a severe impairment as of December 4, 2017, the ALJ determined that she nonetheless had the following residual functional capacity ("RFC"):[4]

> Based on the impairments present since December 4, 2017, the claimant has had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: She cannot climb ladders ropes or scaffolds. Must avoid concentrated pulmonary irritants such as fumes, odors, dust and gasses as well as workplace hazards such as unprotected heights and machinery. She would need to be allowed to wear sunglasses while working. She would be limited to simple, routine and repetitive tasks, involving only simple work-related decisions with few, if any, workplace changes with no strict

---

6. If medical improvement is shown, is the claimant's current impairment nonetheless severe? If not, the claimant's disability will be found to have ended.
7. If the claimant's current impairment is severe, does the claimant nonetheless have the residual functional capacity to perform the claimant's past work? If so, the claimant's disability will be found to have ended.
8. If the claimant is not able to perform his or her past work, can the claimant perform other work? If so, the claimant's disability will be found to have ended. If not, the claimant's disability will be found to continue.

*Johnson v. Sec'y of Health & Human Servs.*, 948 F.2d 989, 991 (6th Cir. 1991).
[4] A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1).

9

> production quotas or fast-paced work such as on an assembly line and only occasional interaction with the general public.

(R. 19–20.) Using this RFC, the ALJ determined that Plaintiff was able to perform a significant number of jobs in the national economy. (R. 34.) Accordingly, the ALJ concluded that Plaintiff's disability ended as of December 4, 2017. (R. 34–35.)

## IV. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).

Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the

10

SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## V. ANALYSIS

Plaintiff raises the following two issues in her Statement of Errors (ECF No. 18): (1) the ALJ's finding that medical improvement occurred is not supported by substantial evidence; and (2) the ALJ improperly relied on a CDIU report despite lack of evidentiary support. The Court will consider each contention of error in turn.

**A.     The ALJ's medical improvement finding was supported by substantial evidence.**

In 20 C.F.R. § 404.1594, the Regulations outline the process for considering medical improvement and whether a claimant's disability period has ended. The United States Court of Appeals for the Sixth Circuit has described medical improvement as follows:

> The implementing regulations define a medical improvement as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). A determination of medical improvement "must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s)." *Id.* And a medical improvement is related to an individual's ability to work only "if there has been a decrease in the severity . . . of the impairment(s) present at the time of the most recent favorable medical decision and an increase in your functional capacity to do basic work activities . . . ." 20 C.F.R. § 404.1594(b)(3). *See also Nierzwick v. Commissioner of Social Security,* 7 Fed. Appx. 358 (6th Cir. 2001).

*Kennedy v. Astrue*, 247 F. App'x 761, 764–65 (6th Cir. 2007). In other words, medical improvement "is determined by a comparison of prior and current medical evidence . . . ." 20 C.F.R. § 404.1594(c)(1). The regulations further provide that, "[i]f medical improvement has occurred and the severity of the prior impairment(s) no longer meets or equals the same listing section used to make our most recent favorable decision, we will find that the medical improvement was related to your ability to work." 20 C.F.R. § 404.1594(c)(3)(i).

11

The ALJ's found that medical improvement had occurred because, as opined by the state agency psychologists and medical expert, Plaintiff no longer met or equaled the paragraph B criteria for Listing 12.06:

> The medical evidence supports a finding that, by December 4, 2017, there had been a decrease in medical severity of the impairment present at the time of the CPD. At the time of the CPD, the claimant was found to have equaled Listing 12.06AB with regard to her post-traumatic stress disorder. She had reported flashbacks, intrusive thoughts, nightmares of traumatic events, depressed and anxious moods. Updated information suggested ongoing mental symptoms but with psychiatric care attenuating her condition such that her symptoms are less intense and her functioning is better than at the CPD. She is no longer marked in any of the paragraph B criteria, dropping down to moderate limitation throughout. The psychological consulting doctors agreed that the record supports evidence of medical improvement (1A, 19-21F). The medical expert at the hearing also testified as to no marked limitation in any of the paragraph B criteria, which supports an improvement since the CPD. The claimant deferred treatment for her post-traumatic stress disorder early in the CDR record, preferring to work on her self-reported eating disorder with a stress on proper nutrition to benefit her rigorous physical training schedule. The claimant has been out in the community, traveling, teaching, competing in events, taking graduate level coursework at two colleges, and overall functioning at a higher level than she had been during the pay period.

(R. 19.) The ALJ further determined that the medical improvement was related to the ability to work because Plaintiff's impairments no longer met or medically equaled the same listing that was equaled at the time of the CPD. (*Id.*)

The ALJ's conclusion that medical improvement occurred is supported by substantial evidence. Three different reviewing medical sources—medical expert Dr. Andert, and state agency psychologists Dr. Murry-Hoffman and Dr. Matyi—concluded that Plaintiff no longer meets or equals the paragraph B criteria, which are necessary to meet or equal Listing 12.06 (and many other mental health Listings). Medical expert and state agency reviewer opinions are substantial evidence on which the ALJ may rely. *See Swett v. Comm'r of Soc. Sec.*, 886 F. Supp. 2d 656, 661 (S.D. Ohio 2012) ("A medical expert's opinion, based on a review of the complete case record, can constitute substantial evidence.") (citing *Blakley,* 581 F.3d at 408–09); *Burton v.*

*Comm'r of Soc. Sec.*, 690 F. App'x 398, 401 (6th Cir. 2017) (holding an ALJ's opinion relying on state agency reviewers' opinions was supported by substantial evidence). And given that Plaintiff's posttraumatic stress was severe enough to equal Listing 12.06 at the time of the CPD, and given that her more recent impairments (including posttraumatic stress) were not severe enough to equal Listing 12.06 as of December 1, 2017, it logically follows that Plaintiff's impairments must have medically improved. *See Lane v. Comm'r of Soc. Sec.*, No. 2:18-CV-297, 2019 WL 125759, at *5 (S.D. Ohio Jan. 8, 2019), *report and recommendation adopted*, 2019 WL 1277169 (S.D. Ohio Feb. 8, 2019); *Murphy v. Berryhill*, 727 F. App'x 202, 207 (7th Cir. 2018) (finding medical improvement based on physician's assessment that plaintiff no longer met the criteria of a previous listing); *Jones v. Colvin*, No. CIV.A. H-13-1221, 2014 WL 3827819, at *10 (S.D. Tex. July 31, 2014) (same). Thus, the ALJ's decision that medical improvement occurred was supported by substantial evidence.

Despite this substantial evidence, Plaintiff argues that medical improvement has not occurred. In support, she asserts that "[f]irst, her symptoms were not less intense, as evidence[d] by the substantial mental health treatment of record, and second, her functioning is comparable to the functioning at the CPD." (Statement of Errors 26, ECF No. 18.) Plaintiff contends that she was active in school and sports (and this information was noted in her original claim file) at the time she was originally approved for benefits, so her more recent pursuit of education and fitness goals does not demonstrate improvement. (*Id.* at 26–27.) Further, her mental health treatment records document suicidal ideation, thoughts of self-harm, intrusive memories, dissociative flashbacks during treatment sessions, and cognitive distortions, and her treating counselor, Luke Sargent, concluded that she exhibited marked limitations in two of the paragraph B criteria, sufficient to meet or equal Listing 12.06. (*Id.* at 24, 27.) Yet, as the ALJ

13

noted, the record also documents that Plaintiff has been "out in the community, traveling, teaching, competing in events, taking graduate level course work at two colleges and overall functioning at a higher level than she had been during the pay period." (R. 19.) And the fact that Plaintiff was "out in the community under the care of multiple trained professionals with highly supportive and frequent psychotherapy, nutrition therapy and psychiatric medication" (Statement of Errors 29, ECF No. 18) only highlights that, with sufficient accommodations, Plaintiff is capable of a range of activities.

Plaintiff also takes issue with the ALJ's characterization that Plaintiff "deferred treatment for her post-traumatic stress disorder early in the CDR record, preferring to work her self-reported eating disorder with a stress on proper nutrition to benefit her rigorous physical training schedule." (ALJ Decision, R. 19.) But this is a fair assessment of the record, which documents that Plaintiff indicated to VAMC practitioners multiple times in 2017 that she wanted to focus on her eating disorder to the exclusion of other types of "more general" therapies, such as DBT. (*See* R. 962, 1050, 1293, 1288.)

Finally, even assuming *arguendo* that the record evidence could support a finding that Plaintiff had not medically improved, the substantial evidence supporting the ALJ's decision discussed *supra* means that the ALJ's findings were within the permissible "zone of choice," and the Court will not re-weigh the evidence. *See Blakley*, 581 F.3d at 406; *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) ("The substantial-evidence standard allows considerable latitude to administrative decision makers. It presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.") (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

14

**B.     The ALJ did not err in relying on the CDIU investigation.**

Plaintiff argues that the ALJ should not have relied on the CDIU investigation, "which contains errors on the face of the evidence." (Statement of Errors 30, ECF No. 18.) But each of the supposed "errors" Plaintiff complains of were either not errors at all, or were not adopted by the ALJ.

First, Plaintiff objects to the CDIU's finding that Plaintiff had never been diagnosed with a traumatic brain injury. (R. 107.) But the CDIU report merely noted that the VA's own records indicated a lack of diagnosed TBI, which is a note made by Dr. Houle in her March 20, 2017 C&P examination. (R. 1042.) Further, the ALJ nonetheless found that Plaintiff had a severe TBI impairment and considered the impairment in his decision. (Mem. in Opp. 15, ECF No. 21.)

Next, Plaintiff objects to the CDIU report's faulting Plaintiff for her part-time work as a fitness instructor. (Statement of Errors 10–31, ECF No. 18.) Plaintiff argues that her part-time work was irrelevant, because she was also working part-time as of the CPD. (*Id.*) Yet it does contradict Plaintiff's CDR reports that she has no hobbies or interests and that she "always" used a leg brace on her right leg. (R. 261.) The CDIU appropriately considered Plaintiff's part-time work in evaluating Plaintiff's truthfulness in her CDR submissions.

Plaintiff also takes issue with the CDIU's conclusion that there was no diagnosis of either body dysmorphic disorder or anorexia in the record. (Statement of Errors 31, ECF No. 18.) But as the Commissioner points out,

> [T]he ALJ did not deny that Plaintiff had a diagnosis of body dysmorphic disorder or anorexia (Pl. Br. 31). The ALJ found that Plaintiff's eating disorder was a medically determinable impairment and that Plaintiff received counseling for this condition (Tr. 17, 19). The ALJ explained why he found this impairment not severe, which was supported by ME testimony that this impairment was not consistently documented in the record (Tr. 19-20, 52). As mentioned above, the ALJ also acknowledged that Plaintiff's eating disorder was part of her borderline personality disorder, which he did conclude was a severe impairment (Tr. 20-21, 23).

(Mem. in Opp. 15, ECF No. 21.)  Thus, the ALJ appropriately considered Plaintiff's eating disorder, notwithstanding the CDIU's finding of no diagnosis.

Further, Plaintiff asserts she has "refuted" the CDIU detectives' report that Plaintiff showed no signs of anxiety during their interview by submitting a letter from her friend, a Reynoldsburg police officer, who reported that Plaintiff called him upset after the detectives initially knocked on Plaintiff's door.  (Statement of Errors 31, ECF No. 18.)  But this "refutation" is merely evidence that Plaintiff was upset *prior to* the interview, during a time when she was not interacting with CDIU detectives; it does not contradict the CDIU report that she showed no anxiety in the CDIU detectives' presence.

Plaintiff also objects to the CDIU's and ALJ's reliance on Plaintiff's participation in triathlons.  Specifically, Plaintiff objects to the CDIU's statement that she was "training for the Olympics in China" (R. 1115), which "was clearly not accurate nor supported by any other piece of evidence in the file that documented the only events she participated in were para-triathlons." (Statement of Errors 32, ECF No. 18.)  Yet this statement was based on Plaintiff's report to the CDIU detectives, and is consistent with other statements in the record made to treatment providers that she was training for the Olympics or Paralympics.  (R. 1001, 1660.)  Regardless of the specific events at which Plaintiff competed, it is undisputed that she frequently trained for and attended athletic competitions, which is inconsistent with her CDR report allegations that she has no interests or hobbies and "always" uses a brace her for right leg.

Next, Plaintiff argues that the CDIU's findings that "VA records show no evidence that a leg brace was requested or necessary" are inaccurate.  (Statement of Errors 32, ECF No. 18, citing R. 107.)  Yet the only evidence she cites as to assistive devices are prescriptions for an ankle brace following an ankle sprain, and an air heel for plantar fasciitis, both in 2014.  (R.

16

2756, 3156–57.) And although Plaintiff testified to the use of adaptive equipment at athletic competitions, the "corroboration" by third parties on which she relies consists only of another athlete witnessing Plaintiff's apparent vision problems, and a competition organizer confirming that athletes in general may make use of assistive devices or decline to complete certain events due to physical limitations. (R. 355, 389–94.) There is no corroborating evidence that Plaintiff ever did, in fact, make use of these accommodations.

Additionally, Plaintiff argues that several other statements by the ALJ were inaccurate: first, that Plaintiff "did not initiate obtaining a service dog until after the CDR." (Statement of Errors 32, ECF No. 18.) But what the ALJ actually said was, "[i]t appears [Plaintiff] did apply for this dog after the initiation of her 3 year CDR in March 2017 (33F)." (R. 27.) And, in fact, the portion of the record cited by the ALJ is Plaintiff's "Freedom Service Dogs, Inc. (FSD) Client Application," which is dated June 12, 2017. (R. 1653–56.) Although Plaintiff also cites her optometrist's treatment notes indicating that Plaintiff sought paperwork in July 2016 in support a service dog application, it does not appear that Plaintiff actually submitted the application until June 2017—which, more importantly, contradicts her CDR allegations that, as of May 2, 2017, she "always" used a service animal. (R. 261.)

Plaintiff also objects to the ALJ's "characteriz[ation of Plaintiff] as returning to counseling 'after' the CDR, when in fact the CDR documents she had been in therapy in 2016 (Tr.253) and had already been re-evaluated by former psychologist, Dr. Tomcik—at Dr. Tomcik's request—in March 2017 (Tr.1051-1052,1048-1050)." (Statement of Errors 32, ECF No. 18.) But again, there is no inaccuracy in the ALJ's statement that "[a]fter the initiation of her CDR review, the claimant also returned to counseling on 5/12/17," given that the record demonstrates Plaintiff stopped treating with Cranberry Psychological Center at some unspecified

17

point in 2016 (R. 253, 1096–97) and reflects no further counseling until May 2017 when she began treating with Luke Sargent at New Source Counseling Centers (R. 1384).  Her visit with Dr. Tomcik in March 2017 was a mental health psychology assessment and did not involve counseling.  (R. 1048–50.)  Therefore, there is nothing inaccurate in the ALJ's statement.

Finally, Plaintiff objects to the ALJ's characterization that the treatment notes of her counselor, Luke Sargent, do not "contain a lot of information."  (Statement of Errors 32, ECF No. 18.)  The Court recognizes that Mr. Sargent's treatment notes comprise more than one hundred pages, but they do not contain detailed mental status examinations that would be helpful to an ALJ tasked with determining Plaintiff's RFC.  Even so, the ALJ acknowledged that Mr. Sargent's treatment notes "reflect mental status exam findings on the day which [document] improvement from guarded interaction to intermittent interaction to interactive with the claimant alert and oriented generally, with functional status almost always intact and varying mood and affect with some tearfulness (32F)."  (R. 27–28.)  Thus, regardless of the ALJ's characterization of the treatment notes' volume of information, he nonetheless considered them when making his RFC determination.  In sum, the Court can find no error by the ALJ here or in regard to the other purported inconsistencies complained of by Plaintiff.

## VI.  DISPOSITION

In sum, from a review of the record as a whole, the Court concludes that substantial evidence supports the ALJ's decision denying benefits.  For the foregoing reasons, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner of Social Security's decision.

**IT IS SO ORDERED.**

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE